UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| KEVIN WALLACE | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:11-cv-00099-FB |
| | § | JURY DEMANDED |
| TESORO CORPORATION | § | |
| *Defendant.* | § | |

## PLAINTIFF'S FOURTH AMENDED COMPLAINT

NOW COMES PLAINTIFF, KEVIN WALLACE ("Wallace") and, pursuant to Federal Rule of Civil Procedure 15(a), files this Fourth Amended Complaint against Defendant, Tesoro Corporation, and Tesoro Refining and Marketing n/k/a Tesoro Refining and Marketing, LLC (hereinafter jointly referred to as "Defendant" or "Tesoro") and for his causes of action would show the following:

Plaintiff, KEVIN WALLACE ("Wallace") files this Fourth Amended Complaint against Defendant: Tesoro Corporation and Tesoro Refining and Marketing, LLC.

### I. INTRODUCTION

1. This action seeks equitable relief, compensatory damages, special damages, punitive damages, attorney's fees, expert witness fees, taxable costs of court, prejudgment and post-judgment interest for Defendant's retaliation against Plaintiff for whistle blowing

activities under Title VIII of the Sarbanes-Oxley Act of 2002, Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, and 18 U.S.C. § 1514A, *et seq.*

2. This action is brought under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, *et seq.* ("SOX") and specifically 18 U.S.C. § 1514A (b)(1)(B).

## II. PARTIES

3. Plaintiff, Kevin Wallace is an individual currently residing in Bexar, County, Texas.

4. Defendant, Tesoro is a Delaware corporation dually authorized to do business in the State of Texas with its principle place of business and corporate headquarters in San Antonio, Bexar County, Texas. Defendant has entered an appearance through counsel.

5. Defendant Tesoro Refining and Marketing, LLC is a is a Delaware corporation dually authorized to do business in the State of Texas with its principle place of business and corporate headquarters in San Antonio, Bexar County, Texas. This defendant may be served by certified mail, return receipt requested and/or personal service upon its agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Inco at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

6. At all times relevant to this matter, the Defendants operated in cooperation and/or as a joint venture, common business enterprise, partnership, subsidiary, joint employers, or agency. The actions complained of by the Plaintiff in this matter were conducted by the Defendants in the course and scope and in furtherance of said cooperative or joint venture, common business enterprise, partnership, subsidiary, joint employment or agency relationship.

## III. JURISDICTION AND VENUE

7. This Court has subject jurisdiction in this case pursuant to 28 U.S.C. § 1331 as Plaintiff is bringing this claim under the Sarbanes-Oxley Act, specifically 18 U.S.C. § 1514A (b)(1)(B), which provided federal courts with jurisdiction over such claims without regard to amounts in controversy. The Court has personal jurisdiction over the Defendant since they maintain and operate a business in the State of Texas and because they have purposefully availed themselves of the protections of State of Texas.

8. Venue is proper in the United States District Court for the Western District of Texas pursuant to 28 U.S.C. § 1391(a) and (b).

## IV. PROCEDURAL PREREQUISITES

9. All conditions precedent to filing this lawsuit have been met.

10. Plaintiff filed a complaint, with the Occupational Safety and Health Administration ("OSHA") under the Sarbanes-Oxley Act of 2002 ("SOX") with in ninety (90) days after the alleged violation of SOX occurred.

11. Plaintiff filed this action more than one hundred eighty (180) days after he filed his complaint with OSHA.

12. Plaintiff filed this action before the Administrative Review Board issued a final decision on Plaintiff's complaint.

## V. FACTS

13. Defendant Tesoro Corporation is a publicly traded company. It is traded on the New York Stock Exchange under the ticker symbol TSO.

14. Tesoro is a company within the meaning of 18 U.S.C. § 1514A in that it is a company with a class of securities under Section 12 of the Securities Exchange Act of 1934 (15

U.S.C. § 78l) and is required to file reports under Section 15 (d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

15. Defendant Tesoro Corporation operates, through its subsidiaries including Tesoro Refining and Marketing, LLC, seven (7) oil refineries in the United States with a combined capacity of approximately 665,000 barrels per day. Their retail-marketing system includes over 880 branded retail stations.

16. Defendant Tesoro has approximately 17,000 employees world wide.

17. Defendant Tesoro has approximately 800 employees in its San Antonio, Texas corporate headquarters.

18. Mr. Wallace was initially hired by Tesoro on or about June 24, 2004.

19. At the time of his discharge, Mr. Wallace was employed by Defendant Tesoro as its Vice President of Pricing and Commercial Analysis. He was a member of the Marketing Department.

20. Claude Moreau ("Moreau") was Tesoro's Senior Vice President of Marketing. On the day of Plaintiff's termination, Human Resources told Plaintiff that Mr. Moreau approved the termination on behalf of Tesoro.

21. Everett Lewis was Tesoro's Executive Vice President and COO. On the day of Plaintiff's termination, Human Resources employee Pete Borths told Plaintiff that Mr. Lewis approved the termination on behalf of Tesoro.

22. Tracy Jackson was Tesoro's Vice President of Internal Auditing.

23. On two occasions Mr. Wallace checked "yes" to retaliation under the Tesoro Annual Certificate of Compliance which is the Tesoro Sarbanes-Oxley/Anti-Trust compliance vehicle: the first time on the 2008 Compliance Statement that he electronically filed on

February 7, 2009. Even though Mr. Wallace spelled out the type of retaliation he was enduring, no one from Tesoro ever contacted him to investigate.

24. Mr. Wallace filed the 2009 statement on March 12, 2010 around 11:00 a.m. He was not able to print out a copy as he was terminated at approx. 5:00 pm that same day. In the 2009 Compliance Statement, Mr. Wallace again checked the box stating "retaliation". Even though Mr. Wallace checked the box for retaliation for the second year in a row, no one from Tesoro ever contacted him to investigate.

25. During the interim between the two Compliance filings, as part of his job as Tesoro VP of Pricing and Commercial Analysis, Mr. Wallace discovered taxes collected by Tesoro were being booked as revenue and costs were falsely attributed to transactions producing overstated profits in both the branded retail segment and the unbranded marketing segment. The practice of booking the taxes and underreporting costs artificially inflated the profits reported, thereby skewing the financial results reported on the Company's 10-K and 10-Q filings with the SEC. Prior to his termination, Mr. Wallace reported to Sr. VP of Marketing Claude Moreau (his direct supervisor) and Internal Audit that Tesoro was not capturing the revenues properly in the unbranded segment, that the costs were incorrect, and that the profits reported were incorrect. The implications of artificially inflated profits as violative of SEC rules and SOX was readily apparent to all concerned. Tracey Jackson (VP of Internal Audit) acknowledged to Mr. Wallace that the inflated revenue capture and incorrect cost recognition (which was the substance of Mr. Wallace's reports) would result in invalid SEC reporting.

26. During 2009, Mr. Wallace was tasked with the following (in addition to his stated duties) as VP of Pricing and Commercial Analysis:

- COO Everett Lewis tasked Mr. Wallace with developing a netback analysis of all sales and products by class of trade because he did not believe the financial system was producing accurate results.

- CEO Bruce Smith tasked Mr. Wallace with the correction of a serious breach in Tesoro's financial controls that allowed a customer to defraud Tesoro of ninety-two million dollars.

27. Tesoro's financial forecasts and cash performance had not been lining up for some time. It was alleged that Marketing was not forecasting properly as opposed to an improper method of accounting for revenue. Mr. Wallace tasked Monica Prado (Market Strategist) with preparing the monthly financial forecast for the marketing segment. Mr. Wallace instituted many process changes that brought the Marketing forecast into closer agreement with the financial results. Monica Prado resisted these changes and would revert back to the legacy process. Additionally, Monica Prado was assigned netback analysis in the Pacific Northwest, which she proved to be incapable of understanding and/or analyzing the issues involved. Mr. Wallace engaged Louie Rubiola (current Director Investor Relations) in a discussion that resulted in the realization that the real issue regarding forecasting was that the financially reported performance of the Marketing segment could not be reconciled to the cash result. Mr. Wallace tasked Michelle Todesco (Marketing Strategist) with conducting special analysis to reconcile actual transaction detail to booked financial results. This analysis by Ms. Todesco, for the first time, showed that revenues were not being captured correctly in transactions because Tesoro's accounting system had been configured to pass through taxes collected and book them as revenues.

28. While performing the tasks listed above, Mr. Wallace discovered that taxes were being booked as revenues, thereby artificially inflating the profitability of certain segments of

Tesoro. These numbers are reported to the SEC in the company's annual 10-K filing and quarterly 10-Q filings. Thus, Tesoro was knowingly reporting inaccurate information on its SEC-required reporting and in violation of GAAP accounting standards (also an SEC requirement). While investigating the improper recording of taxes as revenues, Mr. Wallace reported the problem to Tesoro VP of Internal Audit Tracy Jackson, his supervisor Sr. VP Claude Moreau[1], and the Director of Commercial Accounting (directly under the Tesoro Controller) Greg Belisle, CPA. After consulting with internal experts, Greg Belisle confirmed to Mr. Wallace that the recording of taxes as revenue was contrary to GAAP. Mr. Belisle also told Mr. Wallace that he had implemented system changes to remedy the improper booking of taxes as revenue that would go into effect April 1, 2010. However, Tesoro employee Keith Leek later informed Mr. Wallace that prior to April 1, 2010, Mr. Moreau called Greg Belisle into his office and persuaded Greg Belisle to not implement the changes intended to remedy the practice of "booking of taxes as revenue". Mr. Belisle also shared with Mr. Wallace that there were additional serious issues in Tesoro's accounting methodology separate and apart from the "booking taxes as revenue" issue. Mr. Wallace remembers at least four members of the CFO ("Chief Financial Officer") organization sharing their lack of confidence in the integrity in the CFO organization. Tesoro has had a revolving door in its financial organization. Tesoro has had three different CFOs in four years. On the same day that Mr. Wallace was dismissed from Tesoro (March 12, 2010), Tesoro also terminated the employment of the head of the Tesoro SOX department (Director of Financial Reporting and Controls

---

[1] At the meeting wherein Mr. Wallace reported the taxes booked as revenue issue, Director of Pricing Jeff Evans and Michelle Todesco were present. Mr. Wallace showed Mr. Moreau the report generated by Ms. Todesco. Mr. Moreau replied that this is a problem for CEO Bruce Smith because Mr. Smith had told the Tesoro Board of Directors different financial results that were then reported to the SEC.

Lance Gebert -who prepared the SEC reports) as well as the Sr. Manager of Financial Reporting (Matt Chapman). As of the date Mr. Wallace was fired, Tesoro had not rectified the booking taxes as revenue issue, had not corrected inaccurate reports provided to the SEC and stockholders, and had taken no action to stop the misreporting from continuing to occur.

29. Just prior to his termination, Mr. Wallace's team was asked by Moreau to validate the pricing strategies employed in the Hawaii retail market. As part of this effort, Mr. Wallace confirmed that the same revenue recognition problems and profit overstatement caused by excise, sales and use taxes counted as profits found in Washington and California were also found in the Hawaii accounting of the retail market as well. Given the far greater magnitude of the higher Hawaii taxes on retail gasoline sales, the overstating of profits was even more substantial than had been discovered in other taxing jurisdictions. Mr. Moreau refused to attend the meeting he requested to discuss the findings of the study conducted by Kristi Burchers, Keith Leek, and Carolyn Valero which was supervised by Mr. Wallace. While the participants were waiting in the conference room (and on a conference call to participants in Hawaii), Mr. Wallace went into Sr. VP Claude Moreau's office next door to ascertain why he was not in attendance at the meeting. Mr. Moreau said he was too busy. Mr. Wallace briefed Mr. Moreau of the results of the study and returned to the conference room where the meeting began. Paul Cannizzo, the individual responsible for the Hawaii and Alaska markets' overall financial optimization, was provided full access to the study as it progressed and agreed with the results and conclusions of the effort. This meeting occurred within a week prior to Mr. Wallace's termination. Mr. Moreau had been avoiding Mr. Wallace for the week

prior to his termination, thus Mr. Wallace provided substantial email summaries of the Hawaii retail performance and pricing strategies studies (which included the booking taxes as revenues) and often provided blind copies to Mr. Moreau's supervisor, COO/EVP Everett Lewis.

30. Claude Moreau, Sr. VP of Marketing, was Mr. Wallace's direct supervisor. Mr. Moreau was the person at Tesoro that retaliated against Mr. Wallace for reporting the "booking taxes as revenue", and Moreau was the person that terminated Mr. Wallace's employment.

31. Mr. Wallace reported serious financial errors on the information reported to the SEC to Tracey Jackson (VP of Internal Audit), specifically the reporting of costs that everyone knew was incorrect and the new issue of booking taxes as revenue. She encouraged him to continue reporting the results of his investigation and said she would do the same. Mr. Wallace notified his supervisor, Sr. VP Claude Moreau, by e-mail of the revenue recognition failure (booking taxes as revenues) and the inappropriate costs being assigned to transactions that executive management (Greg Wright, Everett Lewis, Bruce Smith) knew about but refused to remedy. Mr. Wallace then forwarded a copy of this email to Tracey Jackson. As a result of this report to Internal Audit, a meeting was arranged a few days later with Jackson and two members of the internal audit team, Luz Saunders and Ken Conlin. During this meeting Mr. Wallace explained that invoices had been found that were overstating revenues due to the inclusion of taxes, and were not properly being assigned transactional costs, thus misrepresenting profits. Ms. Jackson expressed concern about SEC reporting and that issue was discussed among the four participants. Jackson admitted that there had already been awareness about the problem, but what Mr.

Wallace was describing was a bigger issue. Saunders and Conlin were assigned to do further investigation and all agreed to keep each other informed. Upon the first indication of the discovery of the failure to properly report profits, Mr. Wallace clearly explained to Tracy Jackson (VP of Internal Audit) that his work uncovered the "booking taxes as revenue" failure. Mr. Wallace continued to investigate and methodically move through different markets and different channels (classes of trade) to learn the full extent of the "booking taxes as revenue" reporting failure. Mr. Wallace did not hear back from Audit (Jackson) prior to his termination. As VP of Pricing and Commercial Analysis at Tesoro, Mr. Wallace was a sub-certifier of Tesoro's quarterly and annual SEC filings. The results of his team's work and the open admission by the VP of Internal Audit (Jackson) that there were known errors in the proper recognition of revenues due to sales, use, excise, and other taxes put Mr. Wallace in a position where he could not lawfully certify the upcoming quarterly filing for the first quarter of 2010.[2] At the time of his termination, Mr. Wallace had discovered that the "booking taxes as revenue" reached across all reported segments of Tesoro's reported financial results, however because his investigation into the "booking taxes as revenue" issue was ongoing, he did not have an opportunity to report the full extent of the inflated revenue/profits. Through reports by Mr. Wallace, Tracy Jackson (VP of Internal Audit), Claude Moreau (Sr VP of Marketing and Mr. Wallace's direct supervisor), Greg Belisle (Director of Commercial Accounting), Tracy Chesley (Director of Distribution Systems Optimization), Chuck Flagg (Sr. VP of Supply and Optimization), Kathleen Fitzgerald (Managing Director of Analysis) and Ralph Grimmer (VP of Transportation) were all aware of Mr. Wallace's investigation

---

[2] The sub-certification for First Quarter 2010 occurs in April 2010. Mr. Wallace was terminated through a "reorganization" on March 12, 2010 without warning.

into Tesoro's financial reporting practice of booking taxes as revenue, as well as his progress up to the time of his termination. All those listed immediately above knew that Tesoro's accounting of Marketing's results did not accurately reflect its performance and that this was intentionally caused by three factors:

    (1). Tesoro's accounting system was deeply flawed and it was feared that the correction of the problem would be costly. The account that absorbed the missing Marketing costs, "netback and other adjustments", contained hundreds of millions of dollars of "errors" caused by the systematic failure to properly recognize transportation costs, sales, excise, and other taxes. There was an absence of SOX compliant financial controls on these accounts and, as evidenced by the number of individuals named above, a culture that routinely accepted known false financial results that were passed along to management, the Board of Directors, the SEC and shareholders in order to maintain the synthetic results of profitability.

    (2). Stock analysts had openly challenged Tesoro on the results of retail marketing and reporting inaccurately high results lessened the open criticism, and

    (3). Claude Moreau was directly compensated based on the reported performance as opposed to the actual performance.

32. Tesoro has misrepresented financial performance internally and externally in reported financial results, to include the total revenue numbers reported in the 10-K and 10-Q SEC filings, as a result of the "booking of taxes as revenues" that Mr. Wallace reported and attempted to correct. Sr. VP Claude Moreau told Mr. Wallace that the substance of Mr. Wallace's findings created problems for Bruce Smith, CEO, as Mr. Smith had informed the Tesoro Board of Directors of different financial results. The foregoing conduct of

defendant as discovered and reported by Mr. Wallace violated the provisions of Section 13a of the Securities Exchange Act of 1934 and Rule 13a-15 to maintain and ensure accurate financial reporting and to "devise and maintain a system of internal controls." and Section 13b of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(b)(2)(B) requirements that no person shall knowingly falsify any book, record, or account. See also 17 C.F.R. § 240.13b2.

33. In response to Mr. Wallace's reports, Tesoro fired him and then offered him a severance package including a strong confidentiality provision, which is not consistent with its own policies and procedures. Kelly Curll, Tesoro in-house counsel who was aware of Mr. Wallace's previous reporting of SOX covered violations, approved the severance agreement on behalf of Tesoro. Mr. Wallace declined the offer of severance due to the requirement that he release all claims attendant to his illegal termination and that he enter into a confidentiality agreement.

34. After Mr. Wallace's termination, he sent a letter to Tesoro's Chairman of the Audit Committee, Steven Grapstein, informing him of the illegal conduct at Tesoro and his illegal termination resulting from his good faith reporting of the illegal conduct. Mr. Wallace also sent a letter with the same content to Ernst & Young, the Independent Audit firm tasked with ensuring SOX compliance. Neither Steven Grapstein, the Audit Committee, nor Ernst & Young ever contacted Mr. Wallace to investigate the matters raised in his letters. Said letters are attached as Exhibit "1" and "2" hereto.

35. Mr. Wallace reported, in good faith, financial reporting by Tesoro that (according to Tesoro employee Greg Belisle, CPA) did not comport with GAAP, that skewed the

revenue, cost and profitability numbers that were reported to the SEC in quarterly and annual filings. Mr. Wallace made the following persons aware of the illegal conduct while he was still employed by Tesoro:

- Tracy Jackson – Tesoro Internal Audit
- Claude Moreau – Tesoro Sr. VP Marketing
- Greg Belisle – Tesoro Director of Commercial Accounting

36. The fact that these employees and officers of the corporation were made aware of the illegal conduct that skewed the financial reporting to stock holders and the federal government, and chose to terminate Mr. Wallace's employment instead of addressing and fixing the illegal conduct, establishes that Mr. Wallace's reporting of the illegal conduct brought about his termination. Further, the knowing refusal of these Tesoro employees and officers to correct the financial reports to the SEC, as well as certified annual shareholder statements, indicates that Tesoro meant for its shareholders and prospective shareholders to rely on these inaccurate financial statements to their detriment and that Mr. Wallace's termination was a part of this effort to cover up these issues.

37. Mr. Wallace reported Sarbanes-Oxley violative activity in good faith that was appropriate to report and factually correct. As a result, his confidentiality was not maintained (in violation of Tesoro's Code of Conduct) and he subsequently endured two years of retaliation by Claude Moreau, Sr. VP of Marketing, culminating in his discharge.

38. During the termination meeting on March 12, 2010, Mr. Wallace asked Managing Director – Labor and Employee Relations Pete Borths if he was aware that Mr. Wallace had made a Tesoro Code of Conduct report. Mr. Borths replied that he did not know and

continued the termination without even inquiring about the substance of the Code of Conduct report.

## VI. COUNT 1

39. Sarbanes-Oxley whistleblower retaliation.

40. Plaintiff reincorporates each of the foregoing paragraphs as if they were set forth fully herein.

41. Tesoro Corporation has a class of securities registered under Section 12 if the Securities and Exchange Act of 1934 or is required to file reports under Section 15(d) of the Securities and Exchange Act of 1934.

42. Wallace was an employee of Tesoro Corporation, and/or one of its officers, employees, contractors, subcontractors, or agents or was a person whose employment could be affected by Tesoro Corporation or one of its officers, employees, contractors, subcontractors, or agents.

43. Wallace provided information to persons with supervisory authority over him and persons employed by Tesoro who had the authority to investigate, discover, or terminate misconduct.

44. Wallace reasonably believed that the information he provided to such persons involved conduct that would constitute a violation of Section 1331, 1343, 1344, and/or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal Law relating to fraud against shareholders.

45. Specifically, and without limitation, Wallace's reports of the booking of taxes collected by Tesoro as revenue in both the external retail and commercial marketing businesses -

thus artificially inflating the profit reported by Tesoro in its public filings would constitute such violations.

46. Tesoro, itself or through its officers, employees, contractors, subcontractors, or agents discriminated against Wallace in the terms and conditions of his employment by creating a hostile work environment and by terminating his employment in retaliation against him for providing such information.

47. Specifically, at the time of Wallace's termination, Moreau was an officer, employee, or agent of Tesoro.

48. Specifically, at the time of Wallace's termination, Everette Lewis was an officer, employee, or agent of Tesoro.

49. Specifically, at the time of Wallace's termination, Tracy Jackson was an officer, employee, or agent of Tesoro.

50. Accordingly, this lawsuit is authorized under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(b)(1)(B).

## VII. ATTORNEY'S FEES

51. Plaintiff reincorporates each of the foregoing paragraphs as if they were set forth fully herein.

52. Plaintiff is entitled to recover attorney's fees and costs for bringing this action pursuant to the Sarbanes-Oxley Act.

## VIII. JURY DEMAND

53. Plaintiff demands a jury trial on all issues triable to a jury.

## IX. RELIEF REQUESTED

54. Accordingly, Wallace respectfully requests that the Court:

a. Grant judgment in Wallace's favor with regard to his claims pleaded under Sarbanes-Oxley, including all compensatory damages, special and consequential damages necessary to make Wallace whole, including but not limited to any equitable relief he may show himself entitled under those statutes;

b. Enter an award of attorney's fees, litigation costs, and expert witness fees to Wallace pursuant to 18 U.S.C. § 1514A(c);

c. For actual and liquidated damages for the period of time provided by law, including appropriate back pay and reimbursement for lost wages, pension, insurance, bonuses, and all other benefits;

d. Reinstatement, or lieu of reinstatement, front pay and reimbursement of future lost wages, pension, insurance, bonuses, equity participation and all other benefits that will be lost in the futures;

e. For compensatory and punitive damages as allowed by law;

f. For pre-judgment and post-judgment interest as allowed by law;

g. For Wallace's cost of court and other expenses; and

h. Award such other and further relief, as this Court deems appropriate.

Respectfully submitted,

**KATZMAN & KATZMAN**

By: /s/ *Alex Katzman*
Alex Katzman
State Bar No. 00786939
10001 Reunion Place, Suite 600
San Antonio, Texas 78216
Telephone: (210) 979-7300

Facsimile: (210) 979-7357
alex@katzmanandkatzman.com

**THE MCKINNEY LAW FIRM**
A PROFESSIONAL CORPORATION


By: /s/ *Christopher J. McKinney*
Christopher J. McKinney
State Bar No. 00795516
110 Broadway St., Suite 420
San Antonio, Texas 78205
Telephone: (210) 832-0932
Facsimile: (210) 568-4101
*chris@themckinneylawfirm.com*


CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been delivered, as designated below, on February 1, 2016.

| | |
|---|---|
| Robert Valadez<br>SHELTON & VALADEZ, P.C.<br>600 Navarro, Suite 500<br>San Antonio, Texas 78205<br>(210) 349-0515 - Telephone<br>(210) 349-3666 - Facsimile | ☐ Hand Delivery<br>☐ Facsimile Transmission (210) 349-3666<br>☐ Certified Mail, Return Receipt Requested<br>☐ U.S. Postal Service First Class Mail<br>X   E-service via CM/ECF |
| Michael Delikat<br>51 W. 52nd Street<br>New York, New York 10019-6142<br>(212) 506-5000 - Telephone<br>(212) 506-5151 - Facsimile<br><br>ATTORNEYS FOR DEFENDANT | ☐ Hand Delivery<br>☐ Facsimile Transmission (212) 506-5151<br>☐ Certified Mail, Return Receipt Requested<br>☐ U.S. Postal Service First Class Mail<br>X   E-service via CM/ECF |

/s/ *Christopher J. McKinney*
CHRISTOPHER J. MCKINNEY